BROWN *v.* THE STATE.

The verdict was warranted by the evidence, and was not contrary to law.        *Judgment affirmed.*

January 11, 1892.

Criminal law. Assault with intent to murder. Verdict. Before Judge McWHORTER. Warren superior court. April term, 1891.

Mollie Brown was charged with assault with intent to murder by administering a certain deadly poison, called Rough on Rats, to B. F. Thompson and others. She was found guilty; her motion for new trial was overruled, and she excepted. The grounds of the motion were, that there was not sufficient evidence to sustain the verdict. The evidence was, in brief, to the following effect:

A physician was called to see Thompson and the others whom defendant was charged with attempting to kill by poisoning, and found them prostrated with nausea, all showing symptoms of being poisoned. Some were prostrated more than others, all evidently having taken something that poisoned them, and from the symptoms he judged it was arsenic. The preparation called Rough on Rats is a deadly poison, containing arsenic more or less, and the physician thought in sufficient quantities to produce death; he had never analyzed Rough on Rats and did not know of his own

v 88-17

knowledge that it contained poison, but that was his opinion; he had seen other people poisoned from Rough on Rats and all the symptoms pointed to poisoning from arsenic, the symptoms of arsenic poisoning being different from other poisons. The woman who cooked the breakfast in question, and Paschal, a servant who worked for Thompson, and a clerk of Thompson who boarded with him, and the members of Thompson's family, all ate at the breakfast and all became sick afterwards, some in an hour and some later on in the day. They were well before breakfast, none of them complaining of being sick at all before the meal. The defendant had been in Thompson's employment up to the evening before as cook, but was discharged because she did not do her work, and because Mrs. Thompson caught her stealing and accused her of it on the same day she was discharged; Mrs. Thompson threatened to take the broom to her. A new servant was at Thompson's, and got supper the evening defendant was discharged. As was Mrs. Thompson's custom, the flour for breakfast was gotten out the night before and put on a table in the kitchen. A little after six o'clock, when the new cook went to Thompson's house in the morning, the defendant came by and said, "Here are some things that belong to Miss 'Beulah" (one of Thompson's daughters), and carried them in. Just as the new cook got through washing her face and hands, she met defendant between the dining-room door and the kitchen, coming out of the cook-room. No one else was in the cook-room. Defendant said nothing to her as she came out. The new cook made biscuit for breakfast out of the flour, putting in nothing else but salt, lard and milk; the milk was in a pitcher in the dining-room, the salt in a box at the kitchen-door, and the lard in a bucket on the kitchen-table. There was a piece of the dough left which was not made up into the biscuits, and

there were some lard and salt left ; and after the persons mentioned were made sick, the new cook used the lard and the balance of the salt, having already used all the milk in making up the bread, and nobody was made sick by the lard and salt afterwards used.   She did not put any poison in the food.   In addition to the biscuit, some meat, eggs, rice and coffee, which had been put out the night before in the kitchen, were prepared for breakfast.   No other person was in the kitchen from the time this cook started the breakfast until she served it, and nobody else had anything to do with preparing it.   After these persons were made sick, the piece' of dough was examined and it had "speckles" on it just like the poison, the poison being a powder and purple-colored.   The door of the kitchen was not locked at night.   When defendant said she had some things for Miss Beulah she had a cup and towel in her hand, and said they were Miss Beulah's things she was going to return ; she was coming from her own house and carried these things back and put them in the kitchen, which was the proper place for her to have returned them.   There were many persons, white and black, living in the neighborhood.   Some of the biscuit were examined afterwards, but the result of the examination the evidence did not disclose.   The defendant knew of Mrs. Thompson's habit to give out the articles for breakfast the night before, and that she had a particular place in the kitchen for leaving them; and Mrs. Thompson had another cook in addition to those mentioned, who was also familiar with her habits, but this other cook had been gone for a month to a town some distance away.   There was a box of Rough on Rats belonging to the Thompsons in the kitchen, which, after the poisoning, was found in the usual place where it had been the custom to keep it for six months.   After Thompson's family were all sick, he went down to a

house about two hundred yards from defendant's house, to which first named house the defendant had gone that morning asking for some fire and saying she was going home and make her children a fire and was going back to bed for she was sleepy; and defendant said to the woman who lived in the house, "Yonder comes Mr. Thompson and Mr. Obe Smith; I don't know what they are coming here for; I aint done anything." Thompson and Smith had not then said anything to her. Thompson carried her back to his house. She did not make to him any statement as to whether or not she knew that any poison of any sort had been given to any member of his family. On Monday before these persons were poisoned (which was on Thursday), witness moved into the house defendant moved out of, and found something over the door which defendant said was rat poison, and which she said was hers, and she took it and carried it away. The stuff in the box was about the kind of stuff that was in the box of Rough on Rats belonging to the Thompsons. About eight o'clock on the day in question, a witness went to defendant's house, and she was getting up, and told this witness she would have laid in bed until dinner-time but the children kept such a fuss she could not sleep; the witness knew she had just got up because she had not put on her clothes, and told the witness she had just got up. After breakfast on the day in question, about eight o'clock, Mrs. Thompson saw defendant about the Thompson residence; defendant came from her house and was peeping round the dairy; she came up there twice, but did not come to the house. The same morning after breakfast another witness saw defendant. This witness was one of the persons who had been made sick. Defendant did not have any conversation with him, but asked some of the negroes if this witness was sick, and he told her he was. He had not told her he

was sick before. When she asked the question she was just sitting around the door at Thompson's store. This was before the doctor was sent for. It was not commented on a great deal that the family were sick or poisoned, and this witness had seen but one of the family. Defendant did not ask about any of the balance of the family. The witness got sick about eight o'clock, the breakfast being about seven, and most of the other members of the family, except Thompson, got sick about the same time. The children had come back from school when defendant asked this witness the question.

J. T. Jordan, by Hines & Felder, for plaintiff in error.

W. M. Howard, solicitor-general, by J. H. Lumpkin, contra.